The defendant and B. B. Owens were indicted for a secret assault upon W. E. French in breach of section 4213 of the North Carolina Code of 1931, and were convicted. From the judgment pronounced the above named defendant appealed to the Supreme Court.
W. E. French and the defendant were husband and wife, residing at 2419 Camden Road in the city of Greensboro. They were married in Greensboro in 1926 and have two children, one six years of age, the other not quite two. In the evening of 1 February, 1932, between 6:30 and 7:30 W. E. French was shot with a pistol and seriously injured. The evidence is voluminous. Such parts of it as are necessary to an explanation of the exceptions are set out in the opinion; but the circumstances immediately connected with the assault are given here as related by W. E. French, Mrs. W. E. French, and B. B. Owens.
W. E. French testified: "I knew Bert Owens prior to 1 February, 1932, and had known him about three years. I was at home during the *Page 634 
afternoon of 1 February, 1932, with my wife's brother and her. In the late afternoon my wife and my wife's brother drove down town. I had a hat in a hat cleaning shop and we drove down town after which we drove towards Sedgefield, stopping at Dixie Pig Barbecue stand where I got two sandwiches and three coca-colas and a pack of cigarettes, after which we drove on to Sedgefield and drove on around there for a while and on back home. Mrs. French's brother, who is about 19 or 20 years of age and Mrs. French were traveling with me in the Chrysler sedan. After we drove back home we had dinner. I imagine it was around six or six-fifteen, I wouldn't be exact. During that time my wife asked me to drive her out in the Starmount section, said she had three friends out there she wanted to see and after dinner we started out, leaving her brother at home, and drove out West Market Street. That was during the time it was under repair. We got to the end of West Market Street and she asked me to turn there to my right. I had never been in that section, never had occasion to go. I turned to my right and had gone down the road a very short distance and passed a car with a man standing on the outside and after passing the car a few feet my wife said, `that is Bert Owens' and asked me to stop and back up which I did. I backed up some few feet back of the car on the opposite side of the road and he walked over on my side of the car and we were standing talking. The car he was standing by was headed towards Friendly Road and my car was headed the same way. When I backed back I backed beyond him. I was sitting under the wheel in my car on the left. He walked around to my side of the car and I asked him what was the trouble and he said he was having motor trouble and he said that his motor was running some and that he thought it would get better. I made the offer to get behind him and push him down this little grade. We were right on a little grade. He said he would wait a few minutes, maybe his car would get all right, and my wife spoke too and said, `I hope you boys have forgotten your little difficulty.' She was on the right side next to me and Mr. Owens spoke up and said he had forgotten his and I explained I could not hold malice, and when I said that he started to shooting and shot me here first, and I fell out of the car on my back. My wife jumped out of the car through the right side front door and I fell out and over on my back and by the time I hit the ground he was over me still shooting and he shot, I don't know how many times, I imagine until he emptied his gun, and walked off a little ways and stopped and hesitated for a second, then he got in my car and left but in the meantime my wife had already gotten in his car and left. The minute I hit the ground I saw her running to his car. He shot me when I was on the ground and I said, `for God's *Page 635 
sake and for my mother's sake, don't shoot me any more.' He shot me right here after I was on the ground. The bullet entered on my right side. He hesitated a minute and got in my car and drove off. After that I lay there for a second or two, I don't know how long, and started to get up. I saw a car coming toward me and I don't know why I though so, I thought it was coming back and I lay back down and the car came up within 75 or 100 yards and played the lights on the place where I was lying and turned around and went back off. Then I got up and I saw a house, you could see the dim front of a house on over towards Holden's Filling Station, and tried to get up that way and I went several yards and began feeling blood coming out of my throat and staggered over and fell in a kindo' ditch or place excavated and finally got out of that and got on the road and by that time the blood was pouring out of my mouth and I lay down on my back and kept adjusting myself to where I was more comfortable. I had on a blue suit and overcoat. The coat had just been cleaned and pressed before I was shot. There was one hole in it and, too, there was a little hole in the back of it. There are some holes in it now. I don't know how many times he shot me. I am able to locate the bullet hole in that vest. When I felt blood coming up into my throat I thought I was going to die. Three boys picked me up and took me away from there. They were Mr. Parker, Mr. Farlow and another. I was lying right on the road close to that intersection when they got to me. I attempted to get help before they came up. A car passed, a Ford of some kind, I imagine, looked like three people in it, and they slowed down real slow and I told them I was shot and asked for help and they slowed like they were going to stop, but didn't and kept on going. After some little time these other boys came and brought me in. They were traveling in an Essex I think. They brought me to St. Leo's Hospital and Dr. Harden treated me after I got there. . . . After I saw I couldn't get out to this filling station, I had a match folder in my pocket and I wrote on it, `Bert Owens killed me.' I didn't think I would get away from there. I got the match folder at the barbecue stand where we bought the barbecue and cigarettes. The object you handed me is the match folder I had in my pocket. The words written on it are `Bert Owens killed me,' signed French. When I wrote that I thought there wasn't any hopes of ever getting away and thinking about my two children and wanting somebody to know who did it, I took this match folder out of my pocket and laid it on this arm with my hand and struck a match and left it on the ground and wrote it and put it in my vest pocket, this part of the folder. I wrote it with my fountain pen. I put this part of the match folder in my vest pocket after writing on it." *Page 636 
Mrs. W. E. French testified in part as follows: "On Monday, 1 February, my husband, my brother and myself left home somewhere around four o'clock. We drove directly to the parking lot back of the Jefferson Standard Life Insurance Company building. Mr. French parked the car and asked me to go to Stratford-Weatherly Drug Company and get him two or three ounces of paregoric. I got out of the car and went in the drug store. I had just a few cents. I had bought some gas and I think I had three or four cents, I didn't have enough to buy the paregoric. I had the paper which you hand me, which purports to be a check, with me that afternoon. It had been mailed to our house on Camden Road. I had this check cashed when I went in Stratford-Weatherly's, and bought the paregoric. From there we drove toward Patterson's Grocery Store on South Elm Street. Mr. French stopped the car and asked me to get his hat at a little dry cleaning place if I am not mistaken next door to Patterson's and asked me to go to the Postal Telegraph Company and wire his insurance premium to the Acacia Life Insurance Company. I did that. I wired them $9.50. From there we drove to Sedgefield and drove home around five o'clock or five-fifteen. My brother, Mr. French and myself drove to Sedgefield. Mr. French suggested that we go out there. We were just riding. We got home about five o'clock, I don't recall the exact time. We had supper after we returned home. That evening before supper my brother and I went to a grocery store. As we were getting ready to leave home my brother went back into the house. He did not make any statement at that time. I don't recall how long he was gone, it was just a minute or two. Then we went to the grocery store and came back home. After that we had dinner and Mr. French asked if I would like to go riding in the evening. I told him I wanted to go to my sister's and he told me he would drive me over there after we went to ride. About six-thirty he asked me to dress so that we could go to ride. I dressed and fed the baby and we drove out toward Starmount Golf Club. When I was putting on my hat in the bath room Mr. French went to his desk in the living room and I saw him writing at his desk. I did not see what he was writing. After he finished writing he put the article upon which he had written in his pocket. Immediately after that we left to go to ride. Mr. French was driving. We started up Camden Road. Mr. French decided he would back up and go down the other way, which he did, to the intersection of Greenway and West Market, and turned to the left and drove out west of town on West Market Street to what I now know as the Holden Road. When we got to the intersection of West Market Street and Holden Road he stopped and looked both ways and then turned to the right and went several yards and I saw the rear light of a car. He drove up almost parallel *Page 637 
with this car and stopped and Mr. Owens stepped out of his car around to Mr. French's side of the car in which he was riding. I knew Mr. Bert Owens prior to 1 February. He came from his car, in front of ours. He walked around to Mr. French's side of the car, Mr. French was driving, and when he saw me sitting in the car he asked Mr. French was what this meant. I asked him if he couldn't forget his difficulties and let bygones be bygones and be friends. When Mr. French said if I didn't get out of the car and shut my mouth he would kill me too. I got out through the right hand front door and fell on the ground. While I was getting out of the car there was a shot fired. I ran and jumped in Mr. Owen's car and the reason I did this was because I was excited. Then I drove away and drove several hundred yards I suppose, some little distance, and decided to turn around and go back, because in the meantime I heard several shots fired. I tried to turn the car around and fainted and I don't remember. I went home that night. The next thing I remember after I fainted I was in Mr. Owen's car and he was driving. I went home. I also went to my sister's that night after I got home. I don't know how I got over there and don't know how long I stayed at my sister's. My sister's name is Mrs. Robert Chrisman. She lives on Percy Street in the city. The next thing I remember after I had gotten home that night and after I had gone to my sister's someone told me Mr. French was shot. The next place I remember being was at the city hall in jail. It was Thursday morning or Thursday afternoon, I don't remember which. February first was on Monday."
B. B. Owens gave the following account of the shooting: "On the afternoon of this tragedy I received a telephone call some where around 5:30. The call was from Mr. French and he wanted to know if I would meet him, as he was leaving town, and there were some things he would like to talk with me about before he left. I replied that I would be at the office until six. He said he did not care to meet me at the office, didn't care to come down town and advanced as his reason that he had been to Raleigh and just been released from jail that day. I offered to come to his house and he said he wanted to meet me privately, would meet me where the Starmount Road turns off West Market Street. I replied that I couldn't come then as my car was on the wash pit. As to the time to meet him there, I do not know whether he told me or whether it was by mutual agreement but it was settled at 6:45 or quarter to seven. I got my car and drove out W. Market Street to the intersection of the road that I knew then as the Starmount Road, and just as I got to the end of the pavement, or where the dirt road turns to the right, I saw a car go over the crest of the ridge, had a trunk rack on it the same as Mr. French's car, so I jumped to the conclusion that it was his car and rode to the top of the ridge. *Page 638 
When I reached the top I could see that it was a smaller car than Mr. French's car, so I stopped and looked back to see if I could see anything of him as I was supposed to be there then. Just as I looked back I saw his car turn. As the car turned I could recognize it from the tire on the side, so I simply got out of the car and stood there, and Mr. French drove up along side of me. As he drove up I could see there was a lady in the car with him. His statement had been that he wished to see me privately, so I walked around and said: `What is the meaning of this, Bill?' meaning why should he drag me out there in the wish to speak to me privately and then bring some one else along. As I walked up along side I recognized the lady as Mrs. French, she spoke, also, almost at the same time I did and I am not accurate as to just what Mrs. French said, but Mr. French did not answer me at all. He whipped around to her and said: `God damn you, if you don't get out of this car and shut up I will kill you too,' and when he said, `I will kill you, too,' I felt kind of funny and jerked the door of his car, at the same time his left hand came out of his coat pocket with a gun. I grabbed his hand with both of my hands and the gun went off. We rolled through the car struggling for the possession of the gun and continued to struggle. The gun went off several times in the struggle. We continued to struggle until Mr. French lay still and I got up, I did not stand over him and shoot him in any such manner as he described. The last I saw of Mrs. French up to the point of the struggle was her rolling out of the door of the car. I did not see what became of my car. It had been raining that day and was rather warm, this being during the warm spell in January and the 1st of February. After I had gotten out of the struggle my car and Mrs. French both were gone. It occurred to me that the first shot that was fired went square in the direction of Mrs. French. I jumped in Mr. French's car and started in the direction my car had been headed as I presumed it had gone that way. I drove between 500 and 1,000 yards and came across my car backed right square across the road. Mrs. French was slumped over the steering wheel with her arms around the steering wheel and her head on her arms. My presumption was that she was shot, and I shoved her over and started back to town. Somewhere between the scene of the shooting and Greensboro Mrs. French came to and said: `What happened? I said, `Nothing. Everything will be all right.' I said, `Are you hurt?' and she said, `I don't think so.' She said `What happened? Where is Bill?' I said, `Everything will be all right. Keep still.' She was highly nervous and pulling at her hands, and I was afraid to say much to her. I said, `I will take you home.' She said, `How about Bill?' I said, `I will go back and see about Bill, and if *Page 639 
I don't call you in a few minutes everything will be all right,' I carried Mrs. French home and put her out in front of the house. I was rather excited myself. I turned back and went back to where the shooting occurred. As I recall it my car was parked directly on the first little ridge in the road, and I drove up on top of that ridge and drove a little beyond it and came back and swung my car so the headlights would swing to and fro and couldn't find any trace of Mr. French. Then I came back down the street to Greensboro."
These inconsistent statements are the source of the various contentions in behalf of the State and of the defendant.
The statute upon which the indictment is founded provides that if any person shall in a secret manner maliciously commit an assault and battery with any deadly weapon upon another by waylaying or otherwise, with intent to kill such other person, although the person assaulted may be conscious of his adversary's presence, he shall be guilty of a felony. In a comprehensive analysis of the statute the trial judge accurately instructed the jury with respect to the law applicable to the various phases of the evidence, and in no aspect is the charge justly subject to the criticism that he failed plainly and correctly to state the evidence or to explain the law.
The State took the position that the defendant and Owens had contrived the assault previously to the meeting on Holden Road, and upon this theory the court submitted to the jury the question of their criminal conspiracy. The defendant contended that there was no evidence of a conspiracy between Owens and herself or of her participation in the assault, and upon this ground she demurred to the evidence and moved that as to her the action be dismissed. The denial of the motion calls for an examination of the testimony concerning the relation of the parties prior to and at the time of the assault.
It is evident that Owens bore toward French a feeling of hostility. Their estrangement, which seems to have originated in visits made by Owens to the residence of French ostensibly to attend and restrain the latter while under the influence of liquor, culminated, according to the testimony of Owens, in their agreement to meet each other at the time and place at which the assault was committed and, impliedly at least, to settle their difficulty, if need be, by violence. French denied the alleged agreement and testified that he and Owens had been friends and *Page 640 
that their "friendship had continued for a considerable length of time."
It is no less manifest that the relation between the defendant and her husband was not cordial. He was addicted to drink; frequently they quarreled; and in the latter part of January she told him that he "would not be living in twenty-four hours." On Sunday evening they had another contentious wrangle, following which he was arrested and imprisoned. Sometime the next day she remitted the premium on his policy or policies of insurance payable in the event of accidental death, in which she was named as beneficiary. It was in evidence that the defendant suggested the direction in which her car should be driven on Monday evening, and that immediately after the assault she abandoned her husband with pitiless unconcern and hastened away in the car of her codefendant, whom she subsequently attempted to defend against the assault. There was evidence in contradiction and explanation, but the apparent inconsistencies were appropriately referred to the jury as the final arbiters of the facts.
The first five exceptions are addressed to parts of French's testimony which was offered for the purpose of showing disagreement and antagonism between the defendant and her husband. It is argued that this testimony was admitted in breach of the statutory provision that neither husband nor wife shall be competent to give evidence against the other; but proof of an assault is an exception to the general rule. C. S., 1802; S. v. Davidson,77 N.C. 522. In S. v. Alderman, 182 N.C. 917, this Court approved the following statement taken from Wharton's Criminal Evidence: "In all cases of personal injuries committed by the husband or wife against each other, the injured party is an admissible witness against the other. Thus, the husband may be a witness against the wife when she is prosecuted for assaulting him." The evidence was competent as tending to disclose the motive, purpose, and extent of the conspiracy.
The sixth exception refers to this incident: In the Greensboro DailyNews of 29 July appeared an article entitled, "Two other charges against Bert Owens." The defendant asked leave to inquire of the jury whether any of them had read the article. She offered neither an affidavit nor evidence of any kind as a basis for the motion and the court in the exercise of its discretion wisely declined to stay the trial and embark upon the proposed exploration. The defendant was not deprived of her right to have the question investigated upon a motion to set aside the verdict. Banks v. Mfg.Co., 108 N.C. 282; S. v. Jackson, 112 N.C. 851.
We see no satisfactory reason for sustaining the exceptions to French's testimony in regard to the policies of insurance and the payment of *Page 641 
the premium. The contents of the policies were entirely collateral to the assault charged in the indictment and were therefore open to parol proof.S. v. Ferguson, 107 N.C. 846; S. v. Surles, 117 N.C. 721; S. v. Sharp,125 N.C. 631; S. v. Hayes, 138 N.C. 660; S. v. Neville, 157 N.C. 591. Besides, the objection is made harmless and the discussion academic in view of the defendant's admission that she knew the policies had been issued and that she paid the premium with her husband's money. Equally competent and material was evidence offered to show the defendant's failure to visit her husband after he had entered the hospital, the agitated "arguments" in which they had often engaged, and the defendant's inclination to "go off and stay out all night."
The remaining exceptions are formal. The case was carefully tried; no competent evidence was excluded to the prejudice of the defendant; the law was accurately applied. We find
No error.